This time we're going to hear Soto v. Gaudett. Good afternoon. May it please the Court, my name is Jerry Glass and I represent the appellants who are seeking a reversal of the District Court's denial of qualified immunity to officers for an accidental collision, a textbook example of a taser deployment to the back of a fleeing suspect and also for two subsequent and simultaneous taser deployments to the back of the suspect as he was getting up off of the ground to resume his flight. With regard to the collision itself, accidentally striking a fleeing suspect is not a seizure under the Fourth Amendment. As the United States Supreme Court has held, it has to be intentional. It has to be part of an effort to apprehend or subdue. And here, the District Court denied qualified immunity with a single sentence. And in the single sentence, the District Court said, consistent with its previous discussion, the Court cannot determine credibility or intent on summary judgment. But in order for there to be some material issue of fact, a genuine issue of fact regarding intent, there must be, as the courts have held, a dispute regarding material fact is only genuine if there's sufficient evidence on which a reasonable jury could find no evidence that Officer Robinson intentionally struck Mr. Soto. The facts, and it's uncontradicted, is that Mr. Soto was running from Officer Setch, who had just yelled at him to stop. He was looking back at Officer Setch at the same time that Officer Robinson was slowing to a stop as he approached Seaside Park, and he was scanning to his right for the suspects. So at the moment of the collision, Mr. Soto was looking behind himself, looking back at Officer Robinson's left to his right, Officer Robinson was looking to his right. There's really no evidence whatsoever of intent. Has there been any proctor of evidence from the people who were passengers in the car, the car that was being chased? So in terms of the car that was being chased, the other suspect, Carl Young, was caught at Seaside Park. He was arrested. Plaintiffs, in their briefing, attached an OIA interview of Mr. Young, which was not sworn, and we have argued that it's inadmissible evidence because it's hearsay. Mr. Young, in terms of this case, they have had years, literally, to get an affidavit. There's no affidavit or deposition? There's no affidavit, no deposition from Mr. Young. And we have attached, additionally, just to put the Court's mind at ease about that, an affidavit from an officer who went out and measured. He was literally, in terms of Mr. Young, two football fields away and 25 feet from a building. I mean, you're looking at the side of a building where he was arrested. There's no way he could have heard or seen the accidental collision. And as further evidence of that fact is that Mr. Young, when asked during the interview, had no knowledge of any taser deployments whatsoever because he couldn't, and I've stood there, he couldn't possibly see or have heard anything. I will note that that's not just the appellant saying that, that this is the only case I've ever had where the plaintiff's expert in use of force, at his deposition, when asked, admitted that there was no evidence that this was an intentional collision. And he even took it a step farther and said, it's more likely than not that this was not an intentional act. In the pleadings, in terms of the evidence, there is no evidence that would suggest that case or the intentional ramming of the rear bumper in the Scott v. Harris case. Turning to the taser deployment, in terms of the taser deployment, this is truly a textbook taser five-second probe deployment to the back, which is the preferred target. But there were two applications of tasers. Yes, Your Honor. One while he was running, and the other after he had stopped, after he had been tased, he was running. Yes, Your Honor. There was actually three taser deployments. The first was exactly as the Court said, while he was running from Officer Setch. After that five-second deployment, when he went down and struck the front of his head, he started, and again I'll just mention, in terms of the taser wire, it is so fine that I have, many times you can snap it with just two fingers, I have a sample if the Court would like to see it, but the act of falling itself can break those wires and break the circuit. Additionally, it was freezing cold that morning. He was wearing a very heavy winter jacket, and when he fell, that could have caused either the probes to separate from the jacket, not in proximity to the skin, so breaking the circuit. He was down on the ground, wasn't he? Yes, Your Honor. And while he was on the ground, he got up into, according to all the witnesses, he got up to a push-up position because he was going to start running again. Because he was going to start running again, what's the evidence of that? Was he told to stay down on the ground? Yes, both Officer Robinson and Sergeant Stepniewski, and their sworn testimony has been submitted, both told him to stay down, stay down. The fact that he was able to get up to a push-up position to start running again proves that the cycle, in terms of the first taser, had been broken. You no longer had neuromuscular incapacitation, the muscles of the back were no longer contracting. And in terms of this case, that's the subsequent simultaneous one, and I'd note that those last two simultaneous deployments were for 2 seconds and 3 seconds. The officers literally had to, after pulling the trigger, if you release it, it will automatically cycle for 5 seconds. They had to literally, with their thumbs, shut off the taser in order to shut it off at 2 seconds and 3 seconds, respectively. It's the definition of showing restraint in the circumstances. The minute he fell from the push-up position, they turned off their devices. I do want to point out one thing, is that we have no disagreement with the District Court when the District Court ruled that it was not clearly established on January 23, 2008, that a taser deployment to the back of a fleeing suspect is unconstitutional. It's what the Court did next. The Court said, but it was established there, back then, that you can't use a taser for the gratuitous use of force, or to gratuitously use a taser to obstruct here, of whether or not, after being struck by the car, Mr. Soto really was capable of standing up and sprinting. As every officer said, as even the circumstantial evidence all shows, there is 50 feet between where he was struck by the car and where he was actually struck with it and fell, in terms of the taser deployment. The taser deployment itself used the maximum 25-foot reach of officers such as taser cartridge, and in terms of this case, absolutely no admissible evidence suggests that he wasn't sprinting, and I apologize for using the expression, but sprinting like a bat out of hell, which is what every officer said and what the physical testimony shows as well. Finally . . . To jump into a completely different point, you're also seeking qualified immunity for the city, the city of Bridgeport. Qualified immunity is not available, except to individuals. I see that my time is over, Your Honor. If you'd like . . . Go right ahead. Why should you be any different than anybody else today? Thank you, Your Honor. I would just say that in terms of, for the city of Bridgeport, I think we were saying that there, any vicarious liability that the city of Bridgeport has for these acts of the officers, which I believe the district court said, because they have been denied qualified immunity and those claims will go forward, to the extent those claims are attributable to the city of Bridgeport as well, that they would go forward. And so they are appellants as well. Yes, Your Honor. Yeah, but they don't, they're not entitled to qualified immunity. The doctrine doesn't apply except to individuals. Yes, Your Honor, that's correct. Good afternoon, Your Honors. My name is Michael Foley. I represent the plaintiff Orlando Soto as conservator of Israel Soto in this case. There's two primary issues I'd like to address with the court. First of all is appellate jurisdiction to hear this case. This case involved issues of contested, issues of fact involving a qualified immunity-based motion for summary judgment, which as this court knows and as the cases that I've cited in my brief, specifically Bolmer v. Oliveira and Garcia v. Sisterink, which hold what the district court has found, there are numerous genuine issues of material fact with respect to the defendant's motion for summary judgment on the issue of qualified immunity that this court lacks appellate jurisdiction over the instant matter since it does not have the power to review or resolve such triable factual issues. I'd also like to cite the case of Johnson v. How can it be a triable issue, for example, with respect to the collision with the police car when all the testimony says exactly, says basically the same thing? Well, we have an affidavit. Where's the other side of it? Well, the other side of it, Your Honor, is we have the affidavit from Mr. Young who indicated that Mr. Soto said, you got me, you got me, before he was struck by the cruiser. That creates an issue of fact. And that in fact was a signed affidavit and notarized. And the Where would we find that? Oh, boy. On what page? Because I mean I have it. We're told that there isn't one and then we're told that there is one. Besides, you know, you're saying, you got me, you got me, is a way to get people to stop running after you. Well, I mean, these are If I could, it's Joint Appendix 1120, Carl Young affidavit. It was sworn. And there was another document from Sergeant Adeletta referred to in his letter where he refers to this, that's 1120, Your Honors, refers to this as a signed, notarized affidavit. He refers to that in his letter to the city, his letter to the chief. So there is an issue of you got me, you got me, before he struck by the car, which indicates he's being compliant. The other thing is, after Officer Robinson Hold on a second. It indicates he's being compliant. That does not mean that the police officer ran his car into him. He was running, wasn't he? Well, he was running, but the police officer went through the stop sign into the crosswalk. I've seen police officers go through stop signs, and he was also on the wrong side of the street. He should have been on the right, and he was on the left, which is probably why your client ran into him, because he didn't expect any car to be there. Right, well, he's going down the road. But the police officers don't seem to obey any of the traffic laws, and that must have, you know, probably was something of a surprise. That's true, Your Honor, but we also have a situation where the same Officer Robinson left the scene of the incident. It was a collision, and he leaves the scene to pursue the vehicle. He doesn't stay there. In his use of force report, he doesn't mention that he struck Israel Soto with the vehicle, which was inconsistent with his OIA statements. In the police report that was drafted by Officer Sesh, who was a witness, he's got the police vehicle on the right side of the road. There's a lot of inconsistencies here, which give rise to the fact that it was intentional. Well, whether it's on the left or the right depends on where you are looking at it. Right. If you're behind it, it can be on the right side of the road, but if you're standing in front of it, it can be on the left side of the road. That's true, Your Honor. So, I don't know how that amounts to. Well, except that it's a misrepresentation of the accident itself in the police report when you read it. There's no stop sign, there's no crosswalk, and the vehicle's, again, on the right side when it should have been indicated on the left side. And he, Officer Robinson, changed his testimony after, when he talks about the use of force report. He never indicates the car accident, and then when he's interviewed by OIA, he says, no, he hit my car, and then he hit the windshield and he fell down. I mean, he changes his testimony, so it gives rise to the inference of the fact it could have been or was intentional, and that's our claim, and that's why the Court says you can't . . . He may have changed his testimony as to particulars, but that doesn't amount to an admission, let alone evidence, of intentional contact. I understand, Your Honor. Does it? Well, except that if you look at the totality of the facts that we presented, I think that it can . . . it does give rise to an inference that it was intentional, and I think we'd like that to be addressed by the jury. I mean, with respect to the motion for summary judgment, there's issues that should be addressed by the jury, and it should go to the jury on that. With respect to the other . . . Is the statement by Young that you're referring to, the one that's on page 1123 . . . Yes. Yes, he fell. He was like, you got me, you got me? Yeah. Is that the only statement you're referring to? Yes, but he says . . . In Young? Yes. But that's the statement that after he was hit. No, because . . . Because the next question is, did he get back up? He didn't know. He was stretched out on the ground. Well, he says he hears him . . . You got me. You got me. Why does that indicate that he had stopped running before he fell? But . . . Before being hit by the car. But he seems to say on page 1125, Your Honor, as you know, I heard a hit. He was like, you got me, you got me? And then when I heard boom. So if you look at that on page 4, I've got 1125, he hears him say, you got me, you got me? And then there's boom. So these guys are chasing him. They're all . . . their adrenaline's pumping. You know, this car was going through fast speeds through the city of Bridgeport, and they're just doing whatever they can. So our position is that it was intentional. With respect to Officer Sesh, you know, clearly he did not know who Israel Soto was at the time he deployed his taser. When these guys got out of the vehicle, they were not there. He did not witness any of them get out of the car at Seaside Park. It was never announced over the radio who they were. And as he was chasing him, he sees Mr. Soto. He doesn't know who he is. He sees Mr. Soto being struck by the police cruiser. Despite that, he decides to deploy his taser at basically a helpless individual who was not suspected of any crime. By then, he had gotten up again and was running again. Well, that's the police version of the facts, Your Honor. Yes. Well, is there another version? Well, I mean, if he's saying, you got me, you got me? And boom, he gets hit by the car. We don't know. We don't have any. There's no cameras on these vehicles, so we don't have specifically what happened to him. We just have the police version of what happened to him at the scene. And that's all we have to go by. But assuming that what he says is correct, there's still an issue of whether he should have deployed his taser under those circumstances, not having given any warning before he would tase him because he didn't know he wasn't a suspect of any crime. Well, they had just chased a car to a park. It's 2.15 a.m. I'm sure there are people who may jog. He was wearing heavy coat. He wasn't wearing jogging togs. But he didn't know if he was the driver, Your Honor. He could have been just a passenger. And if he's a passenger, he hadn't committed any crime. Well, except that surely if they were privileged to tell him to stop. And when he didn't stop, if they didn't know whether he was the driver or whether he was the passenger, surely they could stop him. But they don't know if he's a driver or committed any crime. There's no probable cause to tase him if he's just a person on the sidewalk, if he's just a pedestrian out there. It was unknown to them what he had done. You're saying he's just a person on the sidewalk, and then you said if he's just a passenger. Well, no. I'm not saying he was in the car, Your Honor. Are you suggesting that the park could be full of joggers at 2.15 in the morning? No. He was in the car. That's him, Your Honor. I'm not suggesting. He got out of the car, but Sesh didn't know that at the time he tased him. That's my point. Wouldn't you assume that if someone was the passenger, they wouldn't be running away, whereas someone who was the driver would be running away since the driver is the person who drove the wrong way down a one-way street and then provoked a near collision with a police car? But those are still issues of fact, Your Honor, aren't they? I mean, that would be our position that the issue is a fact. Well, I know, but when we deal with qualified immunity, we're saying that no qualified police officer would do what was done. Right. I'm positing the idea that you could assume reasonably that the person who's running out of the car is the one who fears capture. You run to fear capture, right? I understand that argument, Your Honor, but he didn't see him get out of the car, and we've submitted an affidavit from Jeffrey Albert, our expert, to say that there was no probable cause to tase him based on everything he reviewed, just on the issue of creating an issue of fact. Counsel, is it your view that he was not running away after he collided with the car? No. So you don't deny that he was running away? No, I don't deny he was running, Your Honor. We don't know why exactly he was running, but he was running. No, I don't deny that. You're saying he was or was not? He was running, Your Honor. After the collision with the car? Yeah, well, there really was no collision with the car. The car went up on the side of the arches. That's why I'm hesitating. And then he got up and started running again? Yes. He got out of the car and went running inside the park and kind of did a circle and came back like that. That's what happened. With respect to the—if I have 19 seconds. I'm sorry. I'm starting to confuse the— There's no dispute that after he collided with the police car, he continued to run. He never collided with the police car, Your Honor. That's never been brought up. There was a collision between Mr. Soto and the police car. Oh, yes, the collision with the pedestrian. Is that what you're talking—I'm sorry. I didn't know which segment of this mini-segmented case we were talking about. It's not your fault. It's complicated. Yeah, no, I'm so sorry, Your Honor. No, there was definitely a collision with the police vehicle between the pedestrian and the pedestrian. And after that, he got up and started running? Yes. Yes, he did. Yes. And then he's tased. Continue. You can ignore the red light. All right. So he's tased when he's basically helpless. And Judge Edgerton felt in his decision that it's an issue of fact as to whether he was compliant or not, how much he'd been injured as a result of being struck by the police cruiser, and whether he was really fleeing or what his mental and physical condition was at that point. And then despite that being tased by Sesh, he's on the ground. He's helpless. And Your Honor has asked Mr. Glass this question. He's then simultaneously tased, without warning, by Officers Stepnushki and Sergeant— As he's trying to get up. Yeah. Yeah, but he's on a push-up position. He's helpless. Well, isn't a push-up position very close to the position that runners use at the start of a race? Supported on their arms, all they have to do is move your foot forward, move your knee forward and kick off, and you're off to the races. I guess so, but there's three officers around him. I mean, they clearly have subdued him just by putting their hands on him. They don't have to tase him at that point. That's a point. So, anyway, that's my argument, Your Honor. I'm going over. Thank you. Thank you. So in terms of what was just said, I think it's very important that after the collision with Mr. Robinson's car, the accidental collision, the issue that the district court had was whether or not there was a genuine issue of fact about whether he popped up and started running again. I want to emphasize, no medical doctor has ever said that Mr. Soto was immediately incapacitated. Every officer has repeatedly and consistently said- The most interesting was what incapacitated him because we know he's now permanently incapacitated. So it was the first taser, the collision with the automobile, or the two simultaneous tasers after that? I would submit in terms of judging whether or not Officer Setch had a right to use a taser to the preferred target area of the back at a fleeing suspect, I would just like to point out that in the appellee's brief, they did answer the question of the court a moment ago when on four separate occasions they specifically referred to Mr. Soto after the collision with Robinson's car as getting up and starting to run again. In the Statement of Facts section on page 11, they said Soto got up quickly and ran. In the appellee brief, the Statement of Facts section F, they said after Soto was being struck by Robinson's cruiser and knocked to the ground, before he got back up and started running again. And he actually refers to him later on page 13 as an unidentified running pedestrian. So as the district court thought that there was a genuine issue about whether Mr. Soto popped back up and started running again as every officer said, even the appellees in their brief have recognized and admitted that he did pop back up and run again. I do want to turn to the affidavit and just point out one thing, is that the interview, the OIA interview that was just read from, that was unsworn. The first question is, this is the interview of Carl Young. Hey, Carl, for the record, could you state your date of birth? They didn't swear him in. Then 444 days later, they did give him an affidavit. That's the affidavit that was referred to. Which is that I so answered those questions. The affidavit specifically says only, I have found the same to be a true and accurate account of said interview, but the affidavit doesn't swear and affirm that what was said during that interview was true. And I don't know that an affidavit signed 444 days later can turn an unsworn statement into a sworn statement when all it affirms is that that's what was said on that day, not whether what was said was true. And I go back to the point that if Carl Young was going to testify to this under oath, they have had five years to get an affidavit from Carl Young saying this is what I heard and to produce him for deposition where he could testify and be cross-examined about where he was. There is literally no evidence to contradict Officer Robinson's testimony and every officer's testimony that Mr. Soto, who I might point out also in terms of the circumstantial evidence, never tried to avoid or evade. He literally ran straight into Officer Robinson's vehicle. It's the definition of an accidental collision. It does not constitute a seizure under the Fourth Amendment. Thank you. Thank you. Thank you both. We'll reserve decision. The case of Impala v. The Department of Justice is taken on submission. That's the last case on calendar. Please adjourn court. Court is adjourned.